**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **KENTUCKY INSURANCE GUARANTEE ASSOCIATION,**<br>***Plaintiff,***<br>***v.***<br>**S&A CONSTRUCTORS *et al.*,**<br>***Defendant.*** | **Civil Action**<br>**No. 17-cv-1400** |

**MEMORANDUM OPINION**

**GOLDBERG, J.** **September 21, 2022**

This lawsuit involves a series of surety bonds issued by a predecessor to Plaintiff Kentucky Insurance Guarantee Association to cover construction projects undertaken by Defendant S&A Constructors, LLC. Plaintiff and its predecessor paid creditors pursuant to those bonds, and Plaintiff now seeks reimbursement from S&A Constructors and its two principals, Hengameh Arab and Askar Arab, pursuant to an Indemnity Agreement. Defendants contend they are not required to reimburse Plaintiff for its payments.

Defendants have moved for summary judgment and Plaintiff has cross-moved for partial summary judgment. Defendants assert they have no liability to Plaintiff for any payment and seek a judgment in their favor on all claims. Plaintiff seeks a partial ruling that certain preconditions to payment are met.

For the reasons set out below, I will grant Plaintiff's motion except as to the issue of offset. I will deny Defendants' Motion in its entirety.

## I. FACTUAL BACKGROUND

In deciding a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party. Galena v. Leone, 638 F.3d 186, 196 (3d Cir. 2011). Here, each party has moved for summary judgment. For clarity, and because I am granting Plaintiff's motion in substantial part, the facts below are presented in the light most favorable to Defendants. Those facts are undisputed except where noted.

### A. The Indemnity Agreement

Defendant S&A Constructors, LLC ("S&A") is a construction business. In September 2009, S&A and two individuals affiliated with the business, Defendants Askar Arab and Hengameh Arab, entered into a General Indemnity Agreement (the "Indemnity Agreement") with First Sealord Surety, Inc. ("First Sealord"). The parties executed the Indemnity Agreement in anticipation of First Sealord issuing surety bonds to cover S&A's construction work, a requirement typical of public works projects. See Pa. Nat. Mut. Cas. Ins. Co. v. City of Pine Bluff, 354 F.3d 945, 949 n.2 (8th Cir. 2004); (Indemnity Agreement at 1, "whereas" clauses.)

A surety bond is a three-way contract in which one party, the surety, agrees to "answer for the debt, default, or miscarriage of" the principal to a third-party creditor. Upper Pottsgrove Township v. Int'l Fidelity Ins. Co., 976 F. Supp. 2d 598, 603 (E.D. Pa. 2013) (quoting 74 Am. Jur. 2d Suretyship § 253 (1974)). In this case, S&A is the principal, First Sealord the surety, and S&A's clients and subcontractors the third-party creditors. If S&A defaulted on its obligations to those third parties, First Sealord would be liable to cover S&A's default under the terms of the bond. See Am. Jur. 2d Suretyship § 1.

The Indemnity Agreement provided that Defendants were required to reimburse First Sealord for "all payments … made by [First Sealord] under [First Sealord]'s belief that (i) [First Sealord] was or might be liable therefore, or (ii) the payments were necessary or advisable to

protect any of [First Sealord]'s rights or to avoid or lessen [First Sealord]'s liability or alleged liability." (Indemnity Agreement ¶ 8.) It further provided that First Sealord would "have the right, in its sole discretion, to adjust, settle or compromise any claim," with its "decision thereon [to] be final and binding upon" Defendants. (Id. § 10.) In a suit for reimbursement, First Sealord's "vouchers or other evidence of such payments sworn to by a duly authorized representative" would be "prima facie evidence of the fact and extent of the liability of [Defendants] to [First Sealord]." (Id. § 8.)

**B. First Sealord's Insolvency and Involvement of Plaintiff**

Plaintiff Kentucky Insurance Guarantee Association was created by Kentucky statute to "provide a mechanism for the payment of covered claims" in the event of "the insolvency of an insurer." Ky. Rev. Stat. § 304.36-020. After First Sealord issued the surety bonds at issue in this case, it became insolvent and was placed into liquidation by the Commonwealth Court of Pennsylvania. (Defendants' Statement of Facts in Support of Summary Judgment ("Defendants' Facts") ¶ 2.) Plaintiff became statutorily obligated to pay "covered claims" arising under the bonds. (Id.) Pursuant to that statute, Plaintiff was "deemed the insurer to the extent of its obligation on the covered claims" and would "have all rights, duties, and obligations of [First Sealord] as if [First Sealord] had not become insolvent … ." Ky. Rev. Stat. § 304.36-080. Where the distinction between Plaintiff and First Sealord is not important, this opinion refers to either as "Plaintiff."

**C. Plaintiff's Payments on the Bonds**

First Sealord issued bonds to cover four construction projects relevant to the present lawsuit: Crittenden County Hospital, Russellville Electric Plant Board, Christian County Water District, and Columbia State Community College. (Defendants' Facts ¶ 2.) Plaintiff made payments with respect to each of those four projects and offers documents substantiating the following payments:

| Project | Claimant | Date Paid | Amount |
|---|---|---|---|
| Crittenden Health System | Crittenden County Hospital | 5/11/2015 | $300,000 |
| | Four Rivers Eng. | 9/11/2012 | $610 |
| | Green Mechanical Constructors | 9/11/2012 | $10,562 |
| | Ethridge Excavating | 5/17/2013 | $31,667 |
| | | | |
| Russellville Electric Plant Board | Diversified Electrical | 9/21/2012 | $41,914 |
| | Division 5 Fabricators | 10/22/2012 | $22,697 |
| | | | |
| Christian County Water District | Utility Precast Products | 10/12/2012 | $598 |
| | Irving Materials | 9/20/2012 | $6,588 |
| | Southeast Banking | 4/29/2013 | $2,875 |
| | Jeff Lear Trucking | 10/8/2012 | $3,427 |
| | Jones Bros Towing & Trucking | 3/15/2013 | $1,225 |
| | Paducah Sheet Metals | 10/18/2012 | $6,200 |
| | Phase Tech | 4/29/2013 | $8,750 |
| | Lee Masonry | 10/5/2012 | $3,735 |
| | Thermal Balance | 3/19/2013 | $1,150 |
| | Diversified Woodworking | 3/12/2013 | $6,500 |
| | Western Kentucky Door | 3/21/2013 | $8,754 |
| | Lee Rents | 3/12/2013 | $402 |
| | Kranz Plumbing | 6/24/2013 | $4,288 |
| | Triple S Farms | 3/21/2013 | $1,575 |
| | | | |
| State Building Commission of Tennessee | Schiller Hardware | 10/2/2012 | $24,205 |
| | | | |
| | **Total:** | | **$487,722** |

(Plaintiff did not initially produce documentation for the payment to Schiller Hardware but did so in response to my May 31, 2022 order.)

The parties dispute the justifications for some of the above payments. With respect to the largest (to Crittenden County Hospital), Defendant Askar Arab testified that it was First Sealord's insolvency that caused S&A to default on this project and asserted that when First Sealord became insolvent, the performance bond it had issued for the project "was forfeited" and S&A could not obtain a new performance bond. The client therefore "didn't have any other choice" but to hire a new contractor. In Arab's view, S&A had done "nothing wrong" and First Sealord's insolvency was the only reason S&A could not complete the project. (Askar Arab Tr. at 106.)

Plaintiff takes a different view. An affidavit from Plaintiff's representative Scott Webster attaches an expert report procured by the Hospital that placed the blame for S&A's default on S&A's poor performance. Webster's affidavit further states that Crittenden County Hospital made

a claim against S&A for $724,674, which Plaintiff settled for the $300,000 payment now at issue. (Webster Supp. Aff. ¶¶ 11, 17.)

Plaintiff's representative Scott Webster was asked in a Rule 30(b)(6) deposition to explain this and other payments at issue. As to several, Webster testified that he did not know what the underlying claims were "for." (Webster Tr. at 39, 42, 49.) Webster also failed to answer questions about what due diligence, if any, Plaintiff performed before remitting payment. For example, Webster was unaware whether any representative of Plaintiff spoke to Diversified Electrical or even read S&A's contract with Diversified Electrical before paying that subcontractor's $41,914 claim. (Id. at 42, 45.)

At times, Webster referenced work performed by Plaintiff's attorney Tim Martin. Defendants' attorney requested clarification as to whether there would be an "advice of counsel" issue at trial with "a lawyer … on the stand." (Webster Tr. at 47.) The attorneys also referenced a possible "privilege" issue, but the answer to whether Martin would testify at trial was not put on the record.

When Defendants moved for summary judgment, Plaintiff attached to its brief in opposition an affidavit from Webster that: (1) stated that Martin had reviewed the "validity" of certain claims; and (2) explained Plaintiff's rationale for paying the $300,000 claim to Crittenden County Hospital. (Webster Supp. Aff. ¶¶ 8-17.) Plaintiff also attached an affidavit from Martin detailing how Plaintiff investigated each of the claims before paying them. Neither affidavit was produced in discovery. Martin had not previously been disclosed as a witness.

According to Martin's affidavit, he contacted claimants to request documentation for their claims and also requested documentation from S&A. (Martin Aff. ¶¶ 15-16.) After Martin determined the claims to be covered, Plaintiff paid them. (E.g., id. ¶¶ 19-20.) For most claims,

Martin does not explain what documentation he relied on or how he determined the claims to be covered. As to some claims, Martin states that S&A confirmed the amounts owed. (E.g., id. ¶¶ 40, 48.)

Contrary to Martin's affidavit, Askar Arab testified that he was not contacted by Plaintiff with respect to some claims. (E.g., Askar Arab Tr. 76-77.) Arab also stated that certain letters addressed to S&A were sent to individuals who "didn't have anything to do with" the project in question and were therefore not received. (E.g., id. at 58, 64-65, 68.) Had S&A known about some of those claims, it would have told Plaintiff not to pay them. (E.g., id. at 76-77.)

I ordered the parties to brief whether, if the Webster and Martin affidavits were to be considered at summary judgment, Defendants should be given an opportunity to depose Martin and re-depose Webster. Defendants responded that they wished to depose Martin, which Plaintiff did not oppose. As to Webster, Plaintiff opposed permitting a further deposition and Defendants stated that they did "not seek to re-depose Scott Webster" because they did not wish to give him "another 'bite at the apple', to fix his testimony in a second deposition." I ordered that Martin's deposition go forward, and the parties submitted supplemental briefs to address any issues created by his testimony.

## II.   LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if there is evidence from which a reasonable factfinder could return a verdict for the non-moving party, and a dispute is "material" if it might affect the outcome of the case under governing law. Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the non-moving party. Galena v. Leone, 638 F.3d 186, 196 (3d Cir.

2011). However, "unsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. Schaar v. Lehigh Valley Health Servs., Inc., 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 461 (3d Cir. 1989)).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met by showing that the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." Id. at 322.

After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A).

## III. DISCUSSION

Defendants assert that they are not liable to reimburse Plaintiff for its payments on the surety bonds. Plaintiff cross-moves for summary judgment as to some, but not all, of those reasons. I address the parties' arguments below.

### A. Prima Facie Evidence of Plaintiff's Payments

The Indemnity Agreement between Plaintiff and Defendants contains a so-called "prima facie evidence" clause: "The vouchers or other evidence of … payments sworn to by a duly

authorized representative of [Plaintiff] shall be prima facie evidence of the fact and extent of the liability of [Defendants] to [Plaintiff].” (Indemnity Agreement § 8.) The effect of such a clause is to permit the surety to obtain summary judgment based on its documentation of payments unless the principal can show evidence that the payments were not made or are not reimbursable. See Fallon Elec. Co., Inc. v. Cincinnati Ins. Co., 121 F.3d 125, 129-30 (3d Cir. 1997).

Plaintiff attached to its summary judgment briefing a set of documents purporting to show payments to the creditors listed previously. (As noted, documentation for one creditor, Schiller Hardware, was supplied following my order to do so.) An affidavit from Plaintiff’s representative Webster states that these documents are “[r]ecords indicating the payments on these claims.” (Webster Aff. ¶ 7.) I conclude that these documents and supporting affidavit satisfy Plaintiff’s burden of production under the prima facia evidence clause and, for that reason, Plaintiff is entitled to partial summary judgment that Defendants are liable for these payments unless Defendants can offer evidence that the payments were not made or are not reimbursable.

**B. Allegedly Improper Payments**

Defendants do not dispute that the claimed payments were made but argue that the payments are not reimbursable for numerous reasons. I first address the standard to be applied in determining Defendants’ liability and then determine whether the undisputed facts show that that standard has been met.

1. Standard for Evaluating Plaintiff’s Conduct

The Indemnity Agreement purports to give Plaintiff the “sole discretion” to pay claims and the right to be reimbursed for any payments made under its “belief” that it “was or might be liable therefor.” (Indemnity Agreement §§ 8, 10.) Read literally, these provisions would seem to entitle Plaintiff to reimbursement regardless of the merits of the claims or Plaintiff’s due diligence. Plaintiff concedes, however, that it is not entitled to reimbursement if it pays claims in “bad faith.”

See U.S. Fid. & Guar. Co. v. Feibus, 15 F. Supp. 2d 579, 585 (M.D. Pa. 1998), aff'd, 185 F.3d 864 (3d Cir. 1999).

> Bad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity. Thus, a lack of diligence or negligence is not the equivalent of bad faith, indeed even gross negligence cannot support a finding of bad faith. Bad faith requires a showing of recklessness or improper motive such as self-interest or ill will.

Id. (citations omitted). "The failure to investigate, standing alone and not accompanied by other evidence of an improper motive, is not enough to constitute bad faith." Mountbatten Sur. Co. v. Jenkins, No. 02-cv-8421, 2004 U.S. Dist. LEXIS 20653, at *21 (E.D. Pa. Oct. 12, 2004). Likewise, the fact that the surety could have raised defenses to payment—even "complete defenses"—does not imply that it was bad faith for the surety to pay the claim. RLI Ins. Co. v. Bennett Composites, Inc., No. 04-272, 2005 U.S. Dist. LEXIS 26465, at *21-22 (E.D. Pa. Nov. 2, 2005). While this extraordinarily deferential standard may appear harsh because it could require the principal to reimburse the surety for imprudently settled claims, "[c]ourts have reasoned that the expense, delay, trouble, and risk of loss to the surety is a sufficient safeguard against an unwarranted payment." Colonial Sur. Co. v. DME Construction Assocs., No. 09-cv-956, 2011 WL 4592569, at *4 (M.D. Pa. Sept. 30, 2011) (alterations and quotation marks omitted).

Defendants argue that the bad faith standard does not apply in this case for two reasons. First, Defendants assert that the Indemnity Agreement does not mention bad faith and therefore defaults to the standard that would apply in a common law indemnification suit.

I disagree, because the Indemnity Agreement states that Plaintiff is entitled to reimbursement so long as the claim was paid under the "belief that … [Plaintiff] was or might be liable." (Indemnity Agreement § 8.) This standard is at least as deferential as a bad faith standard. Furthermore, even "[i]n surety cases where the indemnity contract contains no standard, bad faith or fraudulent payment is the sole limiting factor of a surety's enforcement of an indemnity

agreement." U.S. Fidelity and Guaranty Co. v. Bilt-Rite Contractors, Inc., No. 04-cv-1505, 2005 WL 1168374, at *4 n.9 (E.D. Pa. May 16, 2005) (emphasis added).

Second, Defendants argue that a provision in the Indemnity Agreement permitting Plaintiff to act as Defendants' "attorney-in-fact" imposes fiduciary duties on Plaintiff, raising the standard for reimbursement. Specifically, the Indemnity Agreement provides that Defendants "hereby … appoint … [Plaintiff] as their attorney-in-fact" to exercise certain of Defendants' rights. (Indemnity Agreement § 15.) An attorney-in-fact has a duty to act in the principal's interest. 20 Pa. C.S. § 5601.3(a). Defendants thus argue that Plaintiff was required to exercise this heightened care in deciding whether to pay claims on the bonds.

But while the Indemnity Agreement makes Plaintiff an attorney-in-fact for some purposes—such as instructing creditors to escrow funds—Plaintiff's power as attorney-in-fact does not extend to paying claims on bonds. (Indemnity Agreement § 15.) Rather, Plaintiff's right to settle claims is specified in a different section with no reference to Plaintiff's status as attorney-in-fact. (Id. § 10.) The background rule is that a surety does not owe a fiduciary duty to its principal. Reginella Construction Co. v. Travelers Cas. & Surety Co., 949 F. Supp. 2d 599, 612 (W.D. Pa. 2013).

I therefore determine that the bad faith standard applies to Plaintiff's contract claims in this case.

2. Evidence of Bad Faith

I next consider whether Defendants can show, under the applicable summary judgment standard, that Plaintiff paid any of the disputed claims in bad faith.

Defendants' principal evidence of bad faith is that Plaintiff's Rule 30(b)(6) designee, Scott Webster, failed to answer basic questions about Plaintiff's due diligence—including the most rudimentary question of what the claims were for. This was in all likelihood a discovery violation

because a Rule 30(b)(6) designee must be prepared. Black Horse Lane Assoc., L.P. v. Dow Chem. Corp., 228 F.3d 275, 304 (3d Cir. 2000). The question is whether it also would permit a jury to infer that the claims were paid in bad faith.

I conclude that it does not. Treating "designated facts … as established" is one possible sanction available under Rule 37(b)(2)(B) when a witness is inadequately prepared, but it is not the only one. A court may, alternatively, permit the witness to be re-deposed. Wolfson-Verrichia Group, Inc. v. Metro Commercial Real Estate, Inc., No. 08-cv-4997, 2012 WL 13015117, ¶ 30 (E.D. Pa. Jan. 9, 2012). I provided Defendants an opportunity to request this relief but Defendants declined because they did not want to give Webster a chance to "fix his testimony." A litigant cannot obtain a greater sanction by refusing a lesser one. In the absence of a sanction, the fact that Plaintiff produced an unprepared designee does not raise an inference that Plaintiff paid claims "because of dishonest purpose or moral obliquity." Feibus, 15 F. Supp. 2d at 585.

With respect to the $300,000 payment to Crittenden County Hospital, Defendants contend that S&A was not in default on that project and, in fact, the Hospital owed S&A the balance of the contract payment. But the question is not who was at fault but whether the claim was paid in bad faith. While Defendants have raised doubts as to S&A's actual liability, they have not produced any evidence that Plaintiff resolved those doubts in bad faith.

Regarding certain payments to subcontractors, Defendants argue that Plaintiff should have refused payment on the ground that the subcontracts contained "pay if paid" clauses that conditioned the subcontractors' rights to payment on S&A itself receiving payment from the client. Plaintiff in essence blames S&A for not getting paid (by not finishing the jobs), thus making enforcement of "pay if paid" clauses inequitable.

Neither party cites authority for whether a contractor can enforce a "pay if paid" clause against a subcontractor when the reason for nonpayment is that the client considers the contractor in default. While Defendants have shown that the "pay if paid" clauses might have created a defense to S&A's liability, the failure to assert a defense, without more, is not bad faith. Bennett Composites, 2005 U.S. Dist. LEXIS 26465, at *21-22. Defendants have not established that Plaintiff decided to pay the subcontractors for an improper purpose.

I therefore conclude that the undisputed facts show that Plaintiff did not pay the claims at issue in bad faith.

**C. Plaintiff's Statutory Authorization to Pay Claims**

Defendants raise alternative defenses to reimbursement based on Plaintiff's status as a public entity of Kentucky. Defendants first argue that surety bond claims fall outside Plaintiff's statutory authorization, which extends to covered claims of its predecessor, First Sealord, up to a limit of $300,000 per claim in most cases. Ky. Rev. Stat. § 304.36-080(1)(a). These may be claims for "all kinds of direct insurance" with certain enumerated exceptions, one of which is that Plaintiff does not cover any "[m]ortgage guaranty, financial guaranty, or other forms of insurance offering protection against investment risks." § 304.36-030(1)(b). According to Defendants' argument, a surety bond is a type of financial guarantee because it insures against the risk of insolvency by the principal. Thus, Defendants contend that Plaintiff exceeded its statutory authorization when it paid claims on the bonds, meaning it has no right to be reimbursed for those payments.

What Defendants fail to address is what effect such an overstep, assuming it occurred, would have on Plaintiff's contract claim, which arises not under Kentucky statute but under Pennsylvania common law. To the extent the limits of Plaintiff's statutory authority bear any relation to the contract, it is that Plaintiff might have raised a defense in the underlying claims that the statute did not obligate Plaintiff to cover them. But the fact that the surety may have

imprudently passed over a defense does not remove the surety's entitlement to reimbursement so long as the decision was not in bad faith. Feibus, 15 F. Supp. 2d at 585. Therefore, while there is scant authority on what constitutes a "financial guaranty" under § 304.36-030(1)(b), there is no evidence that Plaintiff resolved this ambiguity based on an improper motive.[1]

In a similar vein, Defendants argue that because Kentucky statute only authorizes Plaintiff to pay "covered claims," Plaintiff is not entitled to reimbursement for payments on claims for which S&A had no actual liability. See Ky. Rev. Stat. § 304.36-080(1)(e). The same reasoning applies to this argument: that Plaintiff may have had a defense to payment on the ground that the claims were not "covered" does not, standing alone, mean that Plaintiff paid the claims in bad faith.

**D. Set-Off for Plaintiff's Recovery Against Third Parties**

In First Sealord's liquidation proceeding, Plaintiff received $80,769.99. This recovery was somehow related to the Crittenden County Hospital project but the parties do not clarify what it was based on. Plaintiff's corporate designee conceded that Defendants are entitled to a set-off of this amount. (Webster Tr. 77.) Plaintiff states the opposite in its brief but does not explain why.

Contract damages compensate a plaintiff for loss caused by a breach. Birch Center v. St. Paul Companies, Inc., 787 A.2d 376, 385 (Pa. 2001). Because Plaintiff recovered $80,769.99 in the liquidation proceeding, this is not a loss caused by the breach, and Plaintiff explains no other

---

[1] While I base this ruling on Pennsylvania contract law, I note that Defendants' position has the potential to undermine the apparent purpose of § 304.36-030, which is to protect Kentucky taxpayers from guaranteeing risky financial endeavors that resemble insurance. If Defendants received a windfall by having Plaintiff cover bonds it was not statutorily obligated to cover, it would make little sense to compel Plaintiff to give Defendants a second windfall by letting Defendants keep the benefit of Plaintiff's payments to Defendants' creditors.

reason why it should be allowed a double recovery of this same amount from Defendants. I therefore conclude that Defendants are entitled to a set-off of $80,769.99.

**E. Statute of Limitations**

The parties raise two disputes regarding the statute of limitations governing Plaintiff's contract claims.

1. Contract Under Seal

Previously, I determined that a factual dispute exists as to whether the Indemnity Agreement is a contract "under seal" such that Plaintiff's contract claims are subject to a 20-year statute of limitation as opposed to the normal 4. See Osprey Portfolio, LLC v. Izett, 32 A.3d 793, 797 (Pa. Super. Ct. 2011). Defendants ask that I reconsider this ruling because additional discovery has taken place in which Defendant Askar Arab swore in an affidavit that he "did not intend to sign the Agreement under seal."

Contracts in Pennsylvania are interpreted objectively. See Beneficial Consumer Discount v. Dailey, 644 A.2d 789, 790 (Pa. Super. Ct. 1994). Even if Arab's subjective belief that he did not sign under seal is relevant, it does not change the fact that the face of the contract contains evidence that the contract is under seal, including multiple uses of the word "seal." Accordingly, a factual dispute remains as to whether the Indemnity Agreement is under seal.

2. Claim Accrual

Plaintiff filed suit on March 28, 2017. Plaintiff concedes that, if the Indemnity Agreement is not under seal, it cannot recover for payments made before March 28, 2013, which includes several of the payments at issue in this lawsuit. The parties dispute the accrual date of claims for certain payments made after March 28, 2017. Defendants argue that Plaintiff's claims for reimbursement accrued the moment a creditor made a demand to Plaintiff for payment. Plaintiff disagrees and takes the position that its reimbursement rights accrued when it paid the creditors.

To support their position, Defendants first point to the contractual provision for Plaintiff's collateralization rights. The Indemnity Agreement gives Plaintiff the right to require Defendants to provide collateral for possible future payments. (Indemnity Agreement § 7.) Defendants argue that the collateralization claim and the reimbursement claim are the same breach-of-contract claim—and, therefore, the accrual of one triggers the accrual of the other. As further support, Defendants refer to the provision in the Indemnity Agreement that Plaintiff may exercise "any and all … rights provided to [Plaintiff] under this Agreement … immediately upon the occurrence of" various listed events, one of which is Defendants' "default" or "breach" of a contract covered by a bond. (Indemnity Agreement § 12(a).) Defendants reason that since one of Plaintiff's "rights" under the Indemnity Agreement is the right to reimbursement, that right could have been exercised "immediately" upon an underlying breach by Defendants, meaning the claim for reimbursement must have accrued then.

Plaintiff responds that the Indemnity Agreement permits it to bring "[s]eparate suits … as causes of action accrue from time to time," implying that not all rights under the Agreement accrue at the same time. (Indemnity Agreement § 16.)

There is no binding authority in Pennsylvania for when a reimbursement claim accrues in a contract that also provides for collateralization, and cases in other jurisdictions are split. Compare First Indemnity of America Ins. Co. v. Kemenash, 744 A.2d 691, 698 (N.J. Super. Ct. App. Div. 2000) (reimbursement and collateralization accrue separately), with Balboa Ins. Co. v. Zaleski, 532 A.2d 973, 977 (Conn. App. Ct. 1987) (reimbursement and collateralization accrue together). One federal court in this state has interpreted this authority as "tend[ing] towards the view that such contracts give rise to separate causes of action against both loss and liability, with independent

accrual dates for each." Insurance Comm'r of Connecticut v. Novotny, No. 07-cv-262, 2009 WL 1653553, at *5 (W.D. Pa. June 11, 2009).

I conclude that the approach of Kemenash that collateralization and reimbursement rights accrue separately is the correct one at least for the Indemnity Agreement before me. Plaintiff's reimbursement right is only for "payments … made," not payments contemplated to be made in the future. (Indemnity Agreement § 8.) Thus, before Plaintiff was paid, it had no claim for reimbursement and the claim had not accrued. With respect to the provision that Plaintiff may exercise any of its "rights … under [the] Agreement" immediately upon default by the principal, reimbursement for an un-made payment is not a "right[] … under [the] Agreement," and the provision is therefore inapplicable.

Furthermore, Defendants' position would create administrative problems and undermine the intent of the contracting parties. Before payment is made, the amount of the reimbursement obligation "may not yet be fixed," and it would not be sensible to start running the statute of limitations on a claim that: (1) cannot be brought, and (2) is for an unknown amount. Kemenash, 744 A.2d at 698. Furthermore, the collateralization provision is included in the Indemnity Agreement "for the benefit of the surety," and this purpose would be undermined if it prevented the surety from obtaining reimbursement for payments actually made. Id. at 698-99.

I therefore adopt the view of Kemenash and hold that Plaintiff's reimbursement claims under the contract accrued on the dates Plaintiff paid the underlying third-party claims.

**F. Non-Contract Claims**

In addition to claiming reimbursement under the Indemnity Agreement, Plaintiff asserts claims under multiple common law theories as well as under a Kentucky statute relating to sureties, Ky. Rev. Stat. § 412.080. It is unclear whether Plaintiff seeks partial summary judgment as to these

alternative theories. Defendants seek summary judgment as to all of Plaintiff's theories of recovery.

Neither party has suggested that Plaintiff's common law and statutory claims could entitle Plaintiff to any relief not available under the contract claim. In addition, determining whether Plaintiff could be entitled to reimbursement under these non-contract theories is substantially more difficult, because the standards are different than the bad faith standard that applies to the contract claim. See 1313466 Ontario, Inc. v. Carr, 2008 PA Super 135 ¶ 15 (requiring an equitable subrogee to act with "reasonable care"); Ky. Rev. Stat. § 412.080 (permitting the principal to raise "any defense that might have been made against the original demand").

I will therefore defer consideration of the cross-motions for summary judgment as to Plaintiff's non-contract claims until such time as it appears that these claims are not mooted by Plaintiff's entitlement to reimbursement under the Indemnity Agreement.

## IV. CONCLUSION

For the foregoing reasons, I will grant Plaintiff's motion for partial summary judgment except as to the $80,769.99 set-off and deny Defendants' motion for summary judgment.

An appropriate order follows.